Hampton v. Hanzel, 2018 NCBC 64.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 1259

BRYAN G. HAMPTON, in his
Individual Capacity, in his Capacity
as Successor Trustee of the Thomas
Marion Hampton Testamentary Trust
and as Administrator C.T.A. of the
Estate of Thomas Marion Hampton;
SUSAN E. HAMPTON; JUSTIN Y.
HAMPTON; and RANDOLPH ROAD
ASSOCIATES, LLC,

Plaintiffs,

v.

JOHN F. HANZEL; JOHN F.
HANZEL, P.A.; and STEPHEN H.
LOCKE,

Defendants.

**ORDER AND OPINION ON
PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT
AND DEFENDANT STEPHEN H.
LOCKE'S MOTION FOR SUMMARY
JUDGMENT**

1.    This litigation arises out of the handling of the estate ("Hampton's Estate" or the "Estate") and testamentary family trust (the "Trust") of Dr. Thomas Marion Hampton ("Hampton") who died on November 11, 2004.  Hampton was survived by his second wife, LaTone Marie LaFrance ("LaFrance"), and his three children by his first marriage, Plaintiffs Bryan G. Hampton ("Bryan"), Susan E. Hampton ("Susan"), and Justin Y. Hampton ("Justin").  Defendant Stephen H. Locke ("Locke"), as trustee of the Trust, acted as the controlling owner of Plaintiff Randolph Road Associates, LLC ("Randolph Road"), a company formed by Hampton and in which his children own interests.  Defendant John F. Hanzel ("Hanzel"), a licensed North Carolina attorney and owner of Defendant John F. Hanzel, P.A. (the "Hanzel Firm")

(collectively the "Hanzel Defendants"), was the manager of Randolph Road and the executor of Hampton's Estate. Bryan, in his individual capacity as a beneficiary of Hampton's Estate and the Trust, minority owner of Randolph Road, successor trustee of the Trust, and administrator C.T.A.[1] of Hampton's Estate, and Susan and Justin as beneficiaries of Hampton's Estate and the Trust and minority owners of Randolph Road, contend that Locke and Hanzel engaged in an array of misconduct in their respective roles with the Trust, Estate, and Randolph Road.

2. Before the Court are Plaintiffs' Motion for Partial Summary Judgment on Liability Under Count 3 ("Plaintiffs' Motion for Partial Summary Judgment") and Defendant Stephen H. Locke's Motion for Summary Judgment as to all of Plaintiffs' claims against him ("Locke's Motion for Summary Judgment") (collectively, the "Motions"). For the reasons stated herein, the Court **DENIES** Plaintiffs' Motion for Partial Summary Judgment and **GRANTS in part** and **DENIES in part** Locke's Motion for Summary Judgment.

> *Fitzgerald Litigation, by Andrew L. Fitzgerald and Lee D. Denton, and Hickmon & Perrin, P.C., by James E. Hickmon, for Plaintiffs.*
>
> *Lindley Law, PLLC, by Trey Lindley and Ryan McIntyre, for Defendant Stephen H. Locke.*
>
> *John F. Hanzel, P.A., by John F. Hanzel, pro se and on behalf of Defendant John F. Hanzel, P.A.*

Robinson, Judge.

---

[1] An administrator C.T.A. is "[a]n administrator appointed by the court to carry out the provisions of a will when the testator has named no executor, or the executors named refused, are incompetent to act, or have died before performing their duties and no qualified successor has been named." *Administrator cum testament annexo*, *Black's Law Dictionary* (10th ed. 2014).

## I.    FACTUAL BACKGROUND

3.    The Court does not make findings of fact when ruling on motions for summary judgment, but it may either state those facts that it believes are not in material dispute, state those facts on which a material dispute forecloses summary adjudication, or summarize the underlying facts to provide context for its ruling.  *E.g.*, *In re Estate of Pope*, 192 N.C. App. 321, 329, 666 S.E.2d 140, 147 (2008).  The following statement of facts is solely for the purpose of this Order and Opinion.

### A.    <u>The Parties</u>

4.    Bryan is a resident of Mecklenburg County.  (Verified Compl. ¶ 3, ECF No. 1 ["Compl."]; Answer, Affirmative Defenses, Countercl., & Crosscl. ¶ 3, ECF No. 14 ["Locke's Answer"].)

5.    Susan is a resident of Arlington County, Virginia.  (Compl. ¶ 4; Locke's Answer ¶ 4.)

6.    Justin is a resident of Douglas County, Kansas.  (Compl. ¶ 5; Locke's Answer ¶ 5.)

7.    Randolph Road is a North Carolina limited liability company ("LLC") with its principal place of business in Mecklenburg County.  (Compl. ¶ 6; Locke's Answer ¶ 6.)  Randolph Road is primarily a real estate holding company that owns and leases medical office space.  (Compl. ¶ 8; Locke's Answer ¶ 8.)

8.    Locke is a North Carolina resident and a licensed certified public accountant ("CPA") who is a member of the North Carolina Association of CPAs.  (Pls.'

Mot. Partial Summ. J. on Liability Under Count 3 ["Pls.' Mot. Partial Summ. J."] Ex. 2, at 7:1–2, 7:23–8:1, ECF No. 41.2.)

9. Hanzel, a licensed and practicing North Carolina attorney, is a resident of Mecklenburg County. (Compl. ¶ 16; Locke's Answer ¶ 16; Answer of Def. John F. Hanzel ¶ 16, ECF No. 15 ["Hanzel's Answer"].) Hanzel served as counsel to Hampton in his personal and professional affairs for years prior to Hampton's death. (Aff. Stephen H. Locke ¶¶ 40–41, ECF No. 43.1.)

10. The Hanzel Firm is a North Carolina professional association with its principal place of business in Mecklenburg County. (Compl. ¶ 17; Locke's Answer ¶ 17; Hanzel's Answer ¶ 17.)

### B. Hampton's Will and Family Trust

11. On November 9, 2004, two days before his death, Hampton executed a deathbed will, including a testamentary trust, prepared by Hanzel. (Compl. ¶¶ 10, 19; Locke's Answer ¶¶ 10, 19; Hanzel's Answer ¶¶ 10, 19.) The will named Susan and Hanzel as co-executors of Hampton's Estate. (Compl. Ex. A, Art. IX.A.)

12. The will devised Hampton's tangible personal property and his residuary estate to a Trust created by the will. (Compl. Ex. A, Art. I.) The Trust was to be administered primarily for the benefit of LaFrance until she died, remarried, or cohabitated (a "Terminal Event"). (Compl. Ex. A, Art II.A, Art. VII.A.4.) The Trust was then to be distributed for the benefit of the individual Plaintiffs. Hampton's will appointed Locke as trustee and Hanzel was named the successor trustee if Locke failed or ceased to act for any reason. (Compl. Ex. A., Art. IX.B.) Locke had "the right

to resign [as trustee] without court order at any time in a writing signed by the [t]rustee, such resignation to be effective upon acceptance of the trusteeship by a successor [t]rustee." (Compl. Ex. A, Art. IX.B.) The Hanzel Defendants acted as executors of Hampton's Estate and provided legal services to the Trust for a period of time. (Compl. ¶¶ 20, 22; Hanzel's Answer ¶¶ 20, 22.)

13. The trustee was authorized by the Trust to distribute all or any portion of the net income and principal of the Trust to any one or more of the group consisting of Hampton's descendants and LaFrance in such amounts and at such times as the trustee, in the trustee's discretion, may determine. (Compl. Ex. A, Art. II.A.) The trustee had no obligation to equalize distributions among beneficiaries, and LaFrance was to be the primary beneficiary until a Terminal Event occurred and, thereafter, Hampton's children were to be the primary beneficiaries. (Compl. Ex. A, Art. VII.A.3–4.)

14. The Trust granted the executors of Hampton's Estate and the trustees of the Trust nearly all of the statutory powers that may be granted to fiduciaries under North Carolina law. (Compl. Ex. A, Art. X (incorporating by reference most of the powers enumerated in N.C. Gen. Stat. § 32-27).) The Trust further gave the executors and trustees the power to sell property belonging to the Trust or Estate at fair market value and to "lend money to any such estate or trust at an adequate rate of interest and with adequate security, as determined by the fiduciary[.]" (Compl. Ex. A, Art. X.B.)

15.  Hampton's Estate was administered before the Clerk of Superior Court of Mecklenburg County. (Compl. ¶ 11; Locke's Answer ¶ 11; Hanzel's Answer ¶ 11.) Hanzel and Susan were co-executors until October 2006, at which time Hanzel became the sole executor. (Compl. ¶ 20; Hanzel's Answer ¶ 20.) In 2005, Bryan initiated a caveat proceeding to challenge the validity of Hampton's will. (Locke Aff. ¶ 27.)

16.  On March 15, 2007, before the Trust had been funded with the Estate's assets, LaFrance obtained a loan from Jo-Wall Limited Partnership ("Jo-Wall") to purchase a house in Davie County (the "Jo-Wall Loan") to serve as her new residence. (Compl. ¶¶ 50–51; Locke's Answer ¶¶ 50–51; Hanzel's Answer ¶¶ 50–51.) The Jo-Wall Loan was for $330,000, bore 7% interest, and was for a period of one year. (Compl. ¶ 54; Locke's Answer ¶ 54; Hanzel's Answer ¶ 54; Locke Aff. ¶ 53.k.)

17.  Locke is an employee of Jo-Wall, a foreign company, and is also the treasurer for and a director of JDN, Inc., which is a co-owner of Jo-Wall. (Locke Aff. ¶¶ 2–6.)

18.  In 2007, the Trust was funded with the assets remaining in Hampton's Estate following dismissal of the caveat proceeding initiated by Bryan. (Locke Aff. ¶¶ 27, 33, 35.) The Trust was initially funded with assets worth $1,606,891.61, which included Hampton's interest in several companies and Hampton's personal effects, such as jet skis, tools, cameras, coins, and guns. (Locke Aff. Ex. 1, at Locke 001449–50.)

19. One of the Trust's largest assets was an 85% interest in Randolph Road, valued at $476,850. (Locke Aff. Ex. 1, at Locke 001449.) Each of the individual Plaintiffs owned a 5% interest in this entity. (Compl. ¶ 64; Locke's Answer ¶ 64; Hanzel's Answer ¶ 64.) Randolph Road's major assets were: (1) a 25% interest in a medical office building on which Randolph Road collected rents at all relevant times, and (2) a lake house that had been the residence of Hampton and LaFrance (the "Lake House"). (Locke Aff. ¶ 53.a, Ex. 1, at Locke 001460; Compl. ¶¶ 8, 44; Locke's Answer ¶¶ 8, 44; Hanzel's Answer ¶¶ 8, 44.)

20. Locke, in his role as trustee of the Trust, controlled the majority interest in Randolph Road by virtue of the Trust's 85% ownership interest.[2] Locke, as trustee, appointed Hanzel as manager of Randolph Road. (Compl. ¶ 46; Locke's Answer ¶ 46; Hanzel's Answer ¶ 46; Locke Aff. ¶¶ 41–42.) Hanzel and Locke worked together in making management and financial decisions for Randolph Road. (Compl. ¶ 47; Locke's Answer ¶ 47; Hanzel's Answer ¶ 47.) The Hanzel Defendants were also contracted to perform legal services for the Trust and Randolph Road. (Compl. ¶ 24; Locke's Answer ¶ 24; Hanzel's Answer ¶ 24.)

C. **Administration of the Trust**

21. In early January 2008, Randolph Road sold the Lake House for approximately $945,000, which was subject to an existing mortgage on which

---

[2] Although the undisputed evidence appears to show to the contrary, the Complaint alleges, and Locke's Answer admits, that Locke, as trustee of the Trust, was the "majority owner" of Randolph Road. (Compl. ¶¶ 46, 124, 127; Locke's Answer ¶¶ 46, 124, 127.) The Court will therefore consider the admitted allegations as if true.

Randolph Road owed approximately $180,000. (Compl. ¶ 71; Locke's Answer ¶ 71; Hanzel's Answer ¶ 71; Pls.' Mot. Partial Summ. J. Ex. 2, at 30:21–31:11.) Beginning on January 19, 2008, Susan began sending Locke written correspondence requesting an accounting of the Estate and asking when the individual Plaintiffs could expect their respective 5% shares of the proceeds from the sale of the Lake House and of rents collected from the medical office building over the past three years. (Resp. to Pls.' Mot. Partial Summ. J. ["Locke's Resp."], Exs. A, E, G, ECF Nos. 46.1, 46.5, 46.7.) Locke repeatedly represented that no distribution had been made from Randolph Road and told Susan that she and her siblings would receive distributions from Randolph Road when "declared and paid" to all interest owners. (*See, e.g.*, Locke's Resp. Ex. E.) Around that same time, Susan and Bryan also began communicating with each other about whether there was any way for them to demand that Defendants make a distribution to Randolph Road's members. (Locke's Resp. Ex. E.)

22. On April 1, 2008, Locke distributed $353,100 from the Trust to LaFrance to enable her to pay off the Jo-Wall Loan. (Locke Aff. Ex. 1, at Locke 001480.) Plaintiffs allege that the money distributed from the Trust to LaFrance was, in fact, from the sale of the Lake House, and the individual Plaintiffs were, therefore, entitled to 15% of the proceeds because Randolph Road made a distribution to the Trust (i.e., the majority owner). (Compl. ¶¶ 64, 73–74, 76.)

23. At some time in 2008, the Trust's accounting records began to show as a long-term liability $654,073.26 that had been transferred from Randolph Road to the Trust. (Locke Aff. Ex. 1, at Locke 001473.) Randolph Road's balance sheet for 2008

did not reflect that any money was owed to it by the Trust.  (Ex. 2 to Ex. 2 of Pls.' Mot. Partial Summ. J., at Lake Norman Tax 000105.)  The long-term liability was not subject to a promissory note.  (Pls.' Mot. Partial Summ. J. Ex. 2, at 55:21–58:1.)

24.    On October 30, 2010, Plaintiffs received Locke's accounting of the Trust from the caveat period to that date (the "2010 Trust Accounting").  (Locke Aff. Exs. 1–2.)  The 2010 Trust Accounting showed that LaFrance received $353,100 for a "Mortgage Payoff."  (Locke Aff. Ex. 1, at Locke 001480.)  However, the 2010 Trust Accounting did not disclose that the money was used to repay the Jo-Wall Loan.  (Locke Aff. Ex. 1, at Locke 001480.)  The 2010 Trust Accounting also showed that the Trust owed $654,073.26 to Randolph Road, but gave no indication as to the purpose or terms of the debt.  (Locke Aff. Ex. 1, at Locke 001473.)

25.    In June 2014, LaFrance remarried, thus triggering a Terminal Event.  As a result, the individual Plaintiffs automatically became the sole beneficiaries of the Trust.  (Compl. ¶¶ 39–40; Locke's Answer ¶¶ 39–40; Hanzel's Answer ¶¶ 39–40.)

26.    On August 11, 2014, Hanzel filed a petition to reopen Hampton's Estate with the Mecklenburg County Clerk of Superior Court (the "Clerk"), advising the Clerk that it was necessary to reopen the Estate so that assets from the settlement of an unrelated lawsuit could be placed into the Estate for distribution to the Trust.  (Compl. ¶ 90; Locke's Answer ¶ 90; Hanzel's Answer ¶ 90.)  Some months later, Hanzel told Locke that he had reopened the Estate and that it was necessary for Locke to deliver all remaining Trust assets back to the Estate.  (Compl. ¶ 91; Locke's Answer ¶ 91; Hanzel's Answer ¶ 91.)

27. Around this same time, Locke consulted with Martin J. Halloran ("Halloran"), a CPA, to discuss the Trust. (*See* Halloran Dep. Ex. 2, ECF No. 41.4.) On October 3, 2014, Halloran sent Locke a letter summarizing his opinions on the matters discussed at an earlier meeting. (Halloran Dep. Ex. 2.) As to the long-term liability purportedly owed by the Trust to Randolph Road, Halloran wrote:

> The background of what you told me is that a number of years ago [Randolph Road] distributed funds to the members of [Randolph Road] of which the trust received their [sic] portion. This distribution was not recorded as a receivable on the financials of the LLC so why was it recorded as debt on the financials of the trust? It should not have been recorded this way. I assume [Randolph Road] treated the distribution as a reduction in equity in the financials of [Randolph Road] and as such, should be recorded as equity in the trust. The debt that is now recorded on the trust financials should be moved to equity.

(Halloran Dep. Ex. 2.) The Trust's accounting records for the period ending on September 30, 2014 no longer reflected a long-term liability to Randolph Road, but showed a roughly commensurate increase in Trust equity. (Pls.' Mot. Partial Summ. J. Ex. 1, at Locke 001583, ECF No. 41.1.)

28. On October 1, 2014, Locke resigned as trustee and delivered the Trust assets to Hanzel, as demonstrated by a receipt signed by Hanzel on October 13, 2014. (Compl. ¶¶ 28, 92; Locke's Answer ¶¶ 28, 92, Ex. B.) At that time, the Trust's assets were valued at $990,570.49. (Compl. ¶ 91; Hanzel's Answer ¶ 91; Pls.' Mot. Partial Summ. J. Ex. 1, at Locke 001583.)

29. On September 18, 2015, Hanzel sent a letter to the individual Plaintiffs with several enclosures, including their final distributions and a breakdown of

expenses. (Locke's Resp. Ex. K, ECF No. 46.11.) Hanzel's letter noted that the expenses included payments to Hanzel for $55,000. (Locke's Resp. Ex. K.)

30. On September 25, 2015, Bryan filed a verified petition with the Clerk to remove Hanzel as trustee, and on October 2, 2015, Bryan filed a petition opposing the final accounting and fees paid to Hanzel. (Compl. ¶¶ 102–03; Hanzel's Answer ¶¶ 102–03.) Following a March 21, 2016 hearing on Bryan's petition in opposition to the final accounting, the Clerk entered a consent order on March 24, 2016, reopening the Estate and ordering Hanzel to submit a final account to the Clerk. (Compl. ¶¶ 104–05; Hanzel's Answer ¶¶ 104–05.) Although Hanzel submitted a final account on April 26, 2016 and an amended final account on June 4, 2016, both were rejected by the Clerk. (Compl. ¶ 107; Hanzel's Answer ¶ 107.) On June 30, 2016, the Clerk entered a consent order removing Hanzel as executor of the Estate and ordering him to reimburse the Estate for $91,010.96. (Compl. ¶ 108; Hanzel's Answer ¶ 108.) Plaintiffs allege that the Estate has obtained a judgment against Hanzel for that amount that has not been paid. (Compl. ¶ 109.)

## II. PROCEDURAL HISTORY

31. The Court sets forth here only those portions of the procedural history relevant to its determination of the Motions.

32. Plaintiffs initiated this action by filing their Verified Complaint (the "Complaint") on January 23, 2017. (ECF No. 1.) The Complaint asserts the following

claims against both Locke and the Hanzel Defendants[3]: (1) breach of fiduciary duty, as controlling owner and manager of Randolph Road, respectively (Count III); (2) constructive fraud, as controlling owner and manager of Randolph Road, respectively (Count IV); (3) accounting and information rights (Count X); (4) unfair and deceptive trade practices ("UDTP") (Count XI); and (5) conspiracy (Count XII). (Compl. 17–18, 22–23.) The Complaint additionally asserts claims against the Hanzel Defendants for: (1) breach of fiduciary duty, as executor of the Estate (Count I); (2) constructive fraud, as executor of the Estate (Count II); and (3) professional negligence (Count IX). (Compl. 15–18, 21, 23.) The Complaint asserts claims against Locke for: (1) breach of fiduciary duty, as trustee of the Trust (Count V); (2) breach of trust (Count VI); (3) constructive fraud, as trustee of the Trust (Count VII); and (4) negligence, as trustee of the Trust (Count VIII). (Compl. 17–20, 23.)

33. This action was designated as a mandatory complex business case by order of the Honorable Mark Martin, Chief Justice of the Supreme Court of North Carolina, dated January 24, 2017, (ECF No. 3), and assigned to the undersigned by order of Chief Business Court Judge James L. Gale dated January 25, 2017, (ECF No. 4).

---

[3] The Complaint names the Hanzel Firm as a defendant and states that "[a]ll references to Hanzel refer to Hanzel individually and in the course and scope of his employment with the Hanzel Law Firm." (Compl. ¶ 17.) The Complaint further asserts that all of Hanzel's acts described in the Complaint were performed in the course and scope of his work with the Hanzel Firm and in furtherance of the firm's business. (Compl. ¶ 23.) The Court interprets this to mean that Plaintiffs assert claims against the Hanzel Firm under a theory of *respondeat superior*, although this issue was not addressed by Plaintiffs in their briefs or at the hearing.

34.   On April 4, 2017, Locke filed his Answer, Affirmative Defenses, Counterclaim, and Crossclaim ("Answer"), asserting a counterclaim against Plaintiffs for attorney's fees and a crossclaim against Hanzel for contribution and indemnification. (Locke's Answer 21, 23.)  Locke later voluntarily dismissed his counterclaim. (ECF No. 23.)

35.   On April 6, 2017, the Hanzel Defendants filed an Answer to the Complaint, (ECF No. 15), and an Answer to Locke's Crossclaims, (ECF No. 17), which was later amended, (ECF No. 18).

36.   On January 5, 2018, counsel for the Hanzel Defendants filed a motion requesting that the Court permit counsel to withdraw from representation. (ECF No. 38.) The Court granted the motion. (ECF No. 40.) Mr. Hanzel subsequently entered an appearance on behalf of himself and the Hanzel Firm. (ECF No. 52.)

37.   Following the completion of discovery, on January 22, 2018, Plaintiffs and Locke filed the Motions pursuant to Rule 56 of the North Carolina Rules of Civil Procedure ("Rule(s)"), (ECF Nos. 41, 43), and briefs in support, (ECF Nos. 42, 44). Plaintiffs move for summary judgment on their breach of fiduciary duty claims against Hanzel as manager of Randolph Road and against Locke as controlling owner of Randolph Road. Locke moves for summary judgment on all of Plaintiffs' claims against him. The Hanzel Defendants failed to file a response in opposition to Plaintiffs' motion. The Motions have been fully briefed.

38.     On April 24, 2018, the Court held a hearing on the Motions.  At the hearing, Plaintiffs and Locke were represented by counsel and Hanzel appeared, as counsel, on behalf of the Hanzel Defendants.

39.     On May 31, 2018, the Court entered an order permitting the individual Plaintiffs and the Hanzel Defendants to submit supplemental briefs on the issue of whether the individual Plaintiffs have standing to assert claims against the Hanzel Defendants as manager of Randolph Road.  (ECF No. 54.)  The individual Plaintiffs and the Hanzel Defendants filed supplemental briefs on June 14 and June 27, 2018, respectively.  (ECF Nos. 56–57.)

40.     The Motions are ripe for resolution.

## III.    LEGAL STANDARD

41.     Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law."  N.C. Gen. Stat. § 1A-1, Rule 56(c).  "A 'genuine issue' is one that can be maintained by substantial evidence."  *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000).

42.     The moving party bears the burden of showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Hensley v. Nat'l Freight Transp., Inc.*, 193 N.C. App. 561, 563, 668 S.E.2d 349, 351 (2008).  The movant may make the required showing by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or

would be barred by an affirmative defense, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of her claim." *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835 (citations omitted).

43. "Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784−85, 534 S.E.2d 660, 664 (2000). The Court must view the evidence in the light most favorable to the nonmovant. *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835. However, the nonmovants "may not rest upon the mere allegations or denials of [their] pleading, but [their] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If [the nonmovants] do[] not so respond, summary judgment, if appropriate, shall be entered against [the nonmovants]." N.C. Gen. Stat. § 1A-1, Rule 56(e).

## IV. ANALYSIS

### A. Plaintiffs' Motion for Partial Summary Judgment as to Hanzel

44. Plaintiffs move for summary judgment on their claim that Hanzel, as manager of Randolph Road, breached fiduciary duties owed to Plaintiffs as minority owners of Randolph Road by making a distribution to the majority owner, the Trust, without making a proportionate interim distribution to the individual Plaintiffs. (Pls.' Mot. Partial Summ. J. 1–2, ECF No. 41.) Plaintiffs further argue that, even if the distribution was really an advance or a loan, Hanzel breached his fiduciary duties

to Randolph Road by engaging in a commercially unreasonable transaction that produced no benefit for, and was not in the best interests of, Randolph Road. (Pls.' Br. Supp. 16, ECF No. 42; Compl. ¶¶ 83–84, 86.)

45. Hanzel did not file a response in opposition to Plaintiffs' Motion for Partial Summary Judgment. At the hearing, Hanzel represented that he understood Plaintiffs' motion to be against him as well as Locke, but that he adopted the response filed by Locke's counsel as his own. Under Rule 7.6 of the General Rules of Practice and Procedure for the North Carolina Business Court, where a party fails to file a response brief within the time required by the rule, "the motion will be considered and decided as an uncontested motion."

46. Notwithstanding Hanzel's failure to respond, to be entitled to summary judgment, Plaintiffs, as movants, must carry their burden of demonstrating that there is "no genuine issue as to any material fact and that [Plaintiffs are] entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c).

47. Both Randolph Road and the individual Plaintiffs assert a breach of fiduciary duty claim against Hanzel as manager of Randolph Road. (Compl. 17.) The individual Plaintiffs' claim presents an issue of whether LLC members have standing to assert direct claims for injuries to the company.

48. The individual Plaintiffs argue that they have standing because they are suing for an injury not to Randolph Road, but to themselves. (Pls.' Br. Supp. 23.) The individual Plaintiffs contend that Hanzel distributed Randolph Road's profits to the Trust without making a proportionate distribution to the individual Plaintiffs, thus,

violating their rights under N.C. Gen. Stat. § 57D-4-03. (Suppl. Br. Supp. Pls.' Standing 3–4, ECF No. 56.) The individual Plaintiffs argue that the violation of their statutory right, not just the loss of funds to which they were entitled, was a peculiar and personal injury. (Pls.' Suppl. Br. 4–5.)

49. The Hanzel Defendants argue that the individual Plaintiffs' injury was a diminution in value of their interest in Randolph Road, and was, therefore, not separate and distinct from the injury suffered by the company. (Hanzel Defs.' Resp. Pls.' Suppl. Br. 2–3, ECF No. 57.) The Hanzel Defendants further argue that the individual Plaintiffs did not suffer a violation of their statutory rights because they were not entitled to interim distributions under N.C. Gen. Stat. § 57D-4-03. That statute mandates that, should the LLC elect to make interim distributions, interest owners are entitled to an amount proportionate to the ratio of their aggregate contributions to the LLC. (Hanzel Defs.' Resp. 2.) The Hanzel Defendants contend that, because the individual Plaintiffs were each given a 5% interest in Randolph Road by their father without making a capital contribution, their proportionate amount is zero. (Hanzel Defs.' Resp. 2.) The Hanzel Defendants further argue that the individual Plaintiffs lack standing under N.C. Gen. Stat. § 57D-4-06(a), which provides that a manager who made a distribution in violation of N.C. Gen. Stat. § 57D-4-05 "is personally liable to the LLC but not any other person." (Hanzel Defs.' Resp. 2.)

50. As to the Hanzel Defendants' argument that the individual Plaintiffs have no statutory right to interim distributions, the Hanzel Defendants have not presented

any evidence to enable the Court to conclude as a matter of law that the individual Plaintiffs are not economic interest owners entitled to distributions. In fact, the record contains evidence that contradicts the Hanzel Defendants' position as some of Randolph Road's balance sheets list the individual Plaintiffs' capital contributions.[4] (Ex. 14 to Ex. 2 of Pls.' Mot. Partial Summ. J., at Lake Norman Tax 000211.) Further, the Hanzel Defendants' argument ignores that the transfer of an economic interest entitles the transferee "to receive the economic interest or the portion thereof assigned to the transferee." N.C. Gen. Stat. § 57D-5-02. Because the individual Plaintiffs received their interests in Randolph Road from their father, who formed the company, they presumably would have received an economic interest in the company. Additionally, the argument that N.C. Gen. Stat. § 57D-4-06(a) expressly negates the individual Plaintiffs' standing ignores the fact that the provision is only applicable to claims for wrongful distribution under § 57D-4-05. The individual Plaintiffs claim that the Hanzel Defendants made an improper distribution not under § 57D-4-05, but rather under § 57D-4-03.

51. Members of an LLC generally do not have standing to pursue individual causes of action for injuries to the company unless they can demonstrate that: (1) "the wrongdoer owed [them] a special duty" or (2) "[they] suffered a personal injury—one

---

[4] The financial records for Randolph Road are not a model of clarity. While some of Randolph Road's balance sheets show that the individual Plaintiffs made capital contributions, others list their contributions as negative balances. (*Compare* Ex. 14 to Ex. 2 of Pls.' Mot. Partial Summ. J., at Lake Norman Tax 000211, *with* Ex. 2 to Ex. 2 of Pls.' Mot. Partial Summ. J., at Lake Norman Tax 000104, *and* Ex. 10 to Ex. 2 of Pls.' Mot. Partial Summ. J., at Lake Norman Tax 000147.)

that is 'separate and distinct from the injury sustained *by the other [members]* or the [company] itself.'" *Raymond James Capital Partners, L.P. v. Hayes*, 789 S.E.2d 695, 700–01 (N.C. Ct. App. 2016) (emphasis added) (quoting *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 659, 488 S.E.2d 215, 219 (1997)); *see also Dawson v. Atlanta Design Assocs., Inc.*, 144 N.C. App. 716, 719–20, 551 S.E.2d 877, 879–80 (2001) (applying the *Barger* exceptions to claims brought by LLC members); *Chisum v. Campagna*, 2017 NCBC LEXIS 102, at *21 (N.C. Super. Ct. Nov. 7, 2017) (same).

52.     Because the individual Plaintiffs have presented evidence that the Hanzel Defendants made an improper distribution of Randolph Road's assets to the Trust (i.e., the majority owner and only other member of the company) without making a proportionate distribution to the individual Plaintiffs (i.e, the minority owners), the Court concludes that the individual Plaintiffs have sufficiently established that they suffered an injury separate and distinct from that suffered by the Trust. *See, e.g.*, *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 407–08, 537 S.E.2d 248, 260–61 (2000) (concluding that plaintiff stockholders sufficiently alleged a separate and distinct injury where defendant majority-stockholders and officers diverted corporate assets to themselves and, therefore, "suffered no injuries at all," notwithstanding the fact that the plaintiffs' and the corporation's injuries were identical).

53.     However, standing is only the first hurdle that the individual Plaintiffs must overcome to be entitled to summary judgment on their breach of fiduciary duty claim against the Hanzel Defendants. "For a breach of fiduciary duty to exist, there

must first be a fiduciary relationship between the parties." *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001). Managers of an LLC are obligated to discharge their duties "(i) in good faith, (ii) with the care an ordinary prudent person in a like position would exercise under similar circumstances, and (iii) subject to the operating agreement, in a manner the manager believes to be in the best interests of the LLC." N.C. Gen. Stat. § 57D-3-21(b). Generally, a manager owes these duties to the LLC, not to the LLC's individual members. *Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 474, 675 S.E.2d 133, 137 (2009).

54. Because Plaintiffs have presented no basis on which the Court can conclude that Hanzel owed fiduciary duties to the individual Plaintiffs, the individual Plaintiffs have not met their burden of establishing that they are entitled to judgment against Hanzel as a matter of law. *Atkinson v. Lackey*, 2015 NCBC LEXIS 21, at *37–38 (N.C. Super. Ct. Feb. 27, 2015).

55. Randolph Road also asserts a breach of fiduciary duty claim against Hanzel. (Compl. ¶ 130.) Therefore, the Court must additionally determine whether Plaintiffs have shown that Hanzel breached his fiduciary duties to Randolph Road as a matter of law. In support of their motion, Plaintiffs presented Locke's deposition testimony that Hanzel wrote the check transferring funds from Randolph Road to the Trust without any discussion of repayment or security, and that it was Hanzel's responsibility to maintain Randolph Road's books, which never reflected either the sale of the Lake House or the long-term liability owed by the Trust. (Pls.' Mot. Partial Summ. J. Ex. 2, at 50:16–51:6, 57:11–58:1; Ex. 2 to Ex. 2 of Pls.' Mot. Partial Summ.

J., at Lake Norman Tax 000104–05.)  Plaintiffs argue that, in so doing, Hanzel breached his fiduciary duties to Randolph Road by improperly distributing its profit without regard to the best interests of Randolph Road.  (Pls.' Br. Supp. 13–14, 22.)

56.     However, N.C. Gen. Stat. § 57D-3-21 provides that a manager's duty to act in the best interests of the LLC is "subject to the operating agreement[.]"  N.C. Gen. Stat. § 57D-3-21(b); *see also* N.C. Gen. Stat. § 57D-2-30(a) (providing that an operating agreement may vary the rights and duties of members and managers). Because the Court has not been presented with Randolph Road's operating agreement or conclusive evidence that such an agreement does not exist, the Court cannot conclude as a matter of law that Hanzel breached his fiduciary duty to Randolph Road by failing to act in the company's best interests.  Therefore, the Court concludes that Plaintiffs have not met their initial burden of demonstrating that they are entitled to judgment as a matter of law on their claim that Hanzel breached fiduciary duties owed to Randolph Road.

### B.     Cross-Motions as to Locke

57.     Plaintiffs move for summary judgment on their claim that Locke, as the controlling owner of Randolph Road, breached fiduciary duties owed to Plaintiffs as minority owners.  (Pls.' Mot. Partial Summ. J. 1–2.)  Locke moves for summary judgment on all of Plaintiffs' claims against him.  (Mot. Summ. J. 1–2, ECF No. 43 ["Locke's Mot. Summ. J."].)

### 1.    Locke's Defenses

58.    Locke argues that Plaintiffs' claims fail because: (1) they are barred by the statute of limitations; (2) Plaintiffs cannot show that they suffered damages; and/or (3) to the extent Plaintiffs' claims are based on Hanzel's actions, Locke cannot be jointly and severally liable with Hanzel pursuant to N.C. Gen. Stat. §§ 32-27(24) and 36C-8-807(a).  (Br. Supp. Locke's Resp. Pls.' Mot. Partial Summ. J. 1, ECF No. 47 ["Locke's Br. Opp'n"]; Locke's Mot. Summ. J. ¶¶ 1–3, 5.)

### a.    Statute of Limitations

59.    Locke argues that he is entitled to summary judgment on Plaintiffs' claims for breach of fiduciary duty (Counts III and V), negligence (Count VIII), and UDTP (Count XI) because those claims are barred by the applicable statutes of limitations. (Locke's Mot. Summ. J. ¶ 1.)  The assertion by Locke of the statute of limitations is in the nature of an affirmative defense on which Locke bears the initial burden of proof.  *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835.

### (1)    Breach of Fiduciary Duty Claims

60.    Although Plaintiffs assert separate breach of fiduciary duty claims against Locke as majority owner of Randolph Road and as trustee of the Trust, Plaintiffs' claims arise from the same alleged facts concerning Locke's handling of the Lake House proceeds and the Jo-Wall Loan.  (*Compare* Compl. ¶¶ 131–36, *with* Compl. ¶¶ 148–52.)  Therefore, the Court will address Locke's statute of limitations defense as to both breach of fiduciary claims together.

61.     "Allegations of breach of fiduciary duty that do not rise to the level of constructive fraud are governed by the three-year statute of limitations" under N.C. Gen. Stat. § 1-52(1). *Toomer v. Branch Banking & Tr. Co.*, 171 N.C. App. 58, 66, 614 S.E.2d 328, 335 (2005). "In contrast, [a] claim of constructive fraud based upon a breach of a fiduciary duty falls under the ten-year statute of limitations . . . ." *Wilson v. Pershing, LLC*, 801 S.E.2d 150, 157 (N.C. Ct. App. 2017) (quotation marks omitted).

> For cases involving allegations that a trustee is in breach of its fiduciary duty, [t]he statute of limitations begins to run when the claimant knew or, [by] due diligence, should have known of the facts constituting the basis for the claim. If the materials before the court present a factual question as to when a plaintiff knew or should have known of the facts giving rise to the claim, then this issue must be submitted to the jury.

*Toomer*, 171 N.C. App. at 68–69, 614 S.E.2d at 336 (alterations in original) (citations and quotation marks omitted). Whether a claim is barred by the statute of limitations is a mixed question of law and fact. *Stratton v. Royal Bank of Can.*, 211 N.C. App. 78, 81, 712 S.E.2d 221, 226 (2011). "[O]nce a defendant raises the affirmative defense of the statute of limitations, the burden shifts to the plaintiffs to show their action was filed within the prescribed period." *Laster v. Francis*, 199 N.C. App. 572, 576, 681 S.E.2d 858, 861 (2009). "An order granting summary judgment based on the statute of limitations is proper when, and only when, all the facts necessary to establish the limitation are alleged or admitted, construing the non-movant's pleadings liberally in his favor and giving him the benefit of all relevant inferences of fact to be drawn therefrom." *Wells Fargo Bank, N.A. v. Coleman*, 239 N.C. App. 239, 244, 768 S.E.2d 604, 608 (2015). "When . . . the evidence is sufficient to support an inference that the limitations period has not expired, the issue should be

submitted to the jury." *Baum v. John R. Poore Builder, Inc.*, 183 N.C. App. 75, 81, 643 S.E.2d 607, 611 (2007).

62.     Locke argues that, at the latest, Plaintiffs knew or should have known of Locke's breach on October 30, 2010 and, as such, the statute of limitations for Plaintiffs' breach of fiduciary duty claims expired on October 30, 2013, long before Plaintiffs filed their Complaint on January 23, 2017. (Locke's Br. Opp'n 6–8.) Locke provides a number of dates on which he contends Plaintiffs knew or should have known of the facts constituting the basis for their claims: (1) January 18, 2008, when Susan sent the first of several letters to Locke demanding that Locke distribute to each Plaintiff his or her share of the Lake House proceeds, (Locke's Br. Opp'n 1–2, 7; Locke's Resp. Exs. A, E, G); (2) March 25, 2008, when Susan sent Bryan an e-mail explaining the precise legal theory Plaintiffs allege today—that unless Locke "kept [the sale proceeds] in a special bank account, with only [Randolph Road funds], . . . we could say that a distribution has been made, from the [L]ake [H]ouse, and that we are entitled to our share[,]" (Locke's Resp. Ex. F, at 2, ECF No. 46.6); (3) April 14, 2009, when Susan sent a letter to Locke asking that Locke explain how he had invested the proceeds from the sale of the Lake House, thus showing that Plaintiffs were aware the Lake House proceeds had not been segregated, (Locke's Resp. Ex. G); or (4) October 30, 2010, when Plaintiffs received the 2010 Trust Accounting showing that, beginning in 2008, the Trust owed a long-term liability to Randolph Road for $654,073.26, which Locke argues shows that Plaintiffs knew of the alleged

distribution in 2010, (Locke Aff. Ex. 1, at Locke 001466; *see also* Locke Aff. Ex. 2 (showing the date the accounting was received by Plaintiffs)).

63. Plaintiffs first argue that, because their allegations that Locke breached his fiduciary duty rise to the level of constructive fraud, their claims are timely under the ten-year statute of limitations applicable to such claims. (Pls.' Resp. Br. Opp'n Locke's Mot. Summ. J. 2, ECF No. 45 ["Pls.' Br. Opp'n"].) Plaintiffs further argue that, even under a three-year statute of limitations, their claims are timely because they did not and should not have known of the basis for their breach of fiduciary duty claims until September 30, 2014 when the long-term liability owed to Randolph Road disappeared from the Trust's final accounting. (Pls.' Reply Br. Supp. Mot. Partial Summ. J. 3–5, ECF No. 50 ["Pls.' Reply Br."].) Plaintiffs contend that, up until that point, they justifiably believed Locke's representations that Randolph Road had not made any distributions and that the long-term liability represented a loan to the Trust. (Pls.' Reply Br. 3.) Although Plaintiffs concede that they were concerned about Locke's handling of the Trust and Randolph Road, they argue that because there was nothing inherently wrong with Locke investing Randolph Road's funds instead of making an interim distribution, they were entitled to rely on Locke's representations that no distribution had been made. (Pls.' Reply Br. 4.) Finally, Plaintiffs argue that their claim is not barred under the continuing wrong doctrine or based on equitable estoppel. (Pls.' Br. Opp'n 4–7, 13–14.)

64. The Court does not see the need to reach Plaintiffs' arguments regarding constructive fraud, equitable estoppel, or the continuing wrong doctrine because the

Court cannot conclude as a matter of law that Plaintiffs knew or reasonably should have known prior to January 23, 2014—three years before filing the Complaint—of Locke's alleged breaches of his fiduciary duties as majority owner of Randolph Road or trustee of the Trust. The Court addresses each of Locke's alleged "notice dates" in turn.

65. First, the fact that Plaintiffs demanded distributions from Randolph Road in 2008 does not conclusively demonstrate that they should have been aware of facts underlying their claim against Locke at that time. As noted previously, none of the parties provided the Court with a copy of any operating agreement. In the absence of an operating agreement, and assuming that Plaintiffs' interests in the company devolved from one who made capital contributions to Randolph Road, Plaintiffs, as minority owners, would not be entitled to distributions unless and until interim distributions were made by Randolph Road. N.C. Gen. Stat. § 57D-4-03 ("Distributions to interest owners before the dissolution or winding up of the LLC . . . may be made at such times and in such amounts as determined by the LLC . . . ."). Plaintiffs were aware of this fact as demonstrated by Bryan's March 25, 2008 e-mail to Susan, stating that Plaintiffs had never received any prior distributions and he doubted that Randolph Road's governing documents required that interim distributions be made. (Locke's Resp. Ex. F, at 2.)

66. Susan's March 25, 2008 e-mail to Bryan, although espousing the same legal theory raised by Plaintiffs in this litigation, does not conclusively demonstrate that the individual Plaintiffs were on notice of their entitlement to bring a claim. Susan's

e-mail, explaining that they could claim a distribution if Randolph Road's funds were not kept segregated, does not conclusively demonstrate that Plaintiffs were aware that the funds had not been so kept. In that same e-mail chain and on that same date, Susan told Bryan that she had been asking Locke and Hanzel for a full accounting of the Trust and all assets of the Estate, but had not yet received anything. (Locke's Resp. Ex. F, at 1.) Susan also sent a letter to Locke at that same time asking when she could expect a full accounting. (Locke's Resp. Ex. E, at Locke 001160.) Thus, while Plaintiffs may have been aware of a legal theory that could potentially be pursued against Locke in March 2008, the record before the Court does not conclusively demonstrate they were then aware of facts to support that legal theory.

67. As to Susan's April 14, 2009 letter to Locke demonstrating that she was aware that Randolph Road's funds had been invested, it is not improper as a matter of law for a trustee, acting as majority owner of an LLC by virtue of his role as trustee, to reinvest company assets. N.C. Gen. Stat. § 36C-9-902(a) (providing that "a trustee shall invest and manage trust assets as a prudent investor would"). Thus, the fact that Susan knew on April 14, 2009 that Locke had reinvested the proceeds from the Lake House does not conclusively demonstrate that she should have been aware that this was, in fact, a distribution. Indeed, that same letter demonstrates that on April 14, 2009, Plaintiffs had still not received the requested accounting that may have raised questions as to whether a distribution had been made. (Locke's Resp. Ex. G.) Additionally, Susan asked Locke if he intended to make distributions "any time

soon[,]" further suggesting Plaintiffs did not yet have reason to believe a distribution was made. (Locke's Resp. Ex. G.)

68. Although Plaintiffs received the 2010 Trust Accounting on October 30, 2010, those records show only that the Trust owed Randolph Road a long-term liability, but does not necessarily give Plaintiffs notice that it was really a distribution or an advance made without interest or repayment terms. (Locke Aff. Ex. 1, at Locke 001466, 001472.) Additionally, there is evidence in the record that Locke repeatedly represented to Plaintiffs that no distribution had been made and that each interest owner would receive their proportionate distributions "when declared and paid." (Locke's Resp. Ex. E, at Locke 001160; Locke's Resp. Ex. H, at 23:1–7, ECF No. 46.8; Locke's Resp. Ex. I, at 103:9–20, ECF No. 46.9; Locke's Mot. Summ. J. Ex. E, at 113:18–22, ECF No. 43.10.) Moreover, Locke stated in his sworn affidavit that he did not characterize the transfer of Randolph Road's assets to the Trust as a distribution but as an advance and that he reinvested the cash proceeds from the sale of the Lake House. (Locke Aff. ¶ 55.)

69. As to the Jo-Wall Loan, the 2010 Trust Accounting shows only that LaFrance received $353,100 as a distribution for a "Mortgage Payoff," but gives no indication that the loan payment was ultimately made to Jo-Wall or that Locke had a potential conflict of interest between Jo-Wall, on the one hand, and the Trust or Randolph Road, on the other. (Ex. 3 to Ex. 2 of Pls.' Mot. Partial Summ. J., at Locke 000308.)

70. Although the evidence demonstrates that Plaintiffs had concerns about Locke's administration of the Trust, the Court cannot conclude as a matter of law that Plaintiffs' demands for distributions, their awareness of a particular legal theory and that funds had been reinvested, and their receipt of the 2010 Trust Accounting should have put Plaintiffs on notice of their breach of fiduciary duty claims more than three years prior to the filing of the Complaint.

71. Thus, the Court concludes that genuine issues of material fact exist as to when Plaintiffs knew or should have known of Locke's alleged breach and, accordingly, the Court must deny Locke's Motion for Summary Judgment to the extent it asserts that Plaintiffs' breach of fiduciary duty claims against Locke are barred by the statute of limitations.

### (2) UDTP

72. The statute of limitations for a UDTP claim is four years. N.C. Gen. Stat. § 75-16.2. "Under North Carolina law, an action [for UDTP] accrues at the time of the invasion of [the] plaintiff's right." *Newton v. Barth*, 788 S.E.2d 653, 662 (N.C. Ct. App. 2016) (alterations in original). "For actions based on fraud, this occurs at the time the fraud is discovered or should have been discovered with the exercise of reasonable diligence." *Id.*

73. Locke argues that Plaintiffs' UDTP claim is a repackaged claim for breach of fiduciary duty and constructive fraud based on the sale of the Lake House, the transfer of Randolph Road's funds to the Trust, and the repayment of the Jo-Wall Loan, all of which occurred in 2008. (Br. Supp. Def. Stephen Locke's Mot. Summ. J.

14–15, ECF No. 44 ["Locke's Br. Supp."].) Because Locke's and Plaintiffs' arguments are duplicative of the statute of limitations argument raised in relation to Plaintiffs' breach of fiduciary duty claims, the Court concludes that genuine issues of material fact exist as to when Plaintiffs knew or should have known of the basis for their UDTP claim against Locke. Therefore, Locke is not entitled to summary judgment on Plaintiffs' UDTP claim on statute of limitations grounds.

### (3) Negligence

74. As to Plaintiffs' negligence claim, Locke argues that although it is unclear from the Complaint which transactions Plaintiffs allege were negligent, "all discernable transactions with which Plaintiffs take issue occurred between 2007 and 2008" and, thus, their claim accrued in 2010 or 2011. (Locke's Br. Supp. 13–14.)

75. Under N.C. Gen. Stat. § 1-52, the statute of limitations for a negligence action is three years. *Scott & Jones, Inc. v. Carlton Ins. Agency, Inc.*, 196 N.C. App. 290, 297, 677 S.E.2d 848, 853 (2009). "A cause of action based on negligence accrues when the wrong giving rise to the right to bring suit is committed, even though the damages at that time be nominal and the injuries cannot be discovered until a later date." *Birtha v. Stonemor, N.C., LLC*, 220 N.C. App. 286, 292, 727 S.E.2d 1, 7 (2012).

76. Plaintiffs argue that their negligence claim is based on Locke's conduct in turning over Trust assets to Hanzel in 2014. (Pls.' Br. Opp'n 21.) The Complaint alleges that, following the remarriage of LaFrance, Hanzel reopened the Estate and Locke transferred the Trust assets to Hanzel on October 13, 2014, notwithstanding the fact that Hanzel had been publicly reprimanded by the North Carolina State Bar

in relation to another matter for lack of veracity and having a conflict of interest. (Compl. ¶¶ 89–92; Locke's Answer ¶¶ 90–92.) Plaintiffs allege that after Locke transferred the Trust assets to Hanzel, Hanzel made unauthorized disbursements, which the Clerk ordered Hanzel to repay to the Estate in the amount of $91,010.96. (Compl. ¶¶ 97, 108, Ex. B.) Plaintiffs' counsel represented at the hearing that Hanzel has not yet complied with the Clerk's order.

77.    Because Plaintiffs' negligence claim is based on conduct that occurred on October 13, 2014, the Court concludes that the filing of the Complaint on January 23, 2017 was well within the applicable three-year statute of limitations. Therefore, Locke is not entitled to summary judgment on Plaintiffs' negligence claim.

### b.    Damages

78.    Locke argues that he is entitled to summary judgment on Plaintiffs' claims for breach of fiduciary duty (Counts III and V), constructive fraud (Counts IV and VII), negligence (Count VIII), and UDTP (Count XI) because Plaintiffs cannot quantify or prove that they have suffered any damages. (Locke's Mot. Summ. J. ¶ 2.)

79.    Claims for breach of fiduciary duty, constructive fraud, and UDTP require a plaintiff to demonstrate that they suffered actual damages. *Piedmont Inst. of Pain Mgmt. v. Staton Found.*, 157 N.C. App. 577, 589–90, 581 S.E.2d 68, 76 (2003) (noting that actual damages are an essential element of claims for breach of fiduciary duty, constructive fraud, and UDTP). However, according to well-established law, once certain causes of action are established, a plaintiff is entitled to recover nominal damages as a matter of law. *Bogovich v. Embassy Club of Sedgefield, Inc.*, 211 N.C.

App. 1, 12, 712 S.E.2d 257, 264 (2011); *see also Loftin v. QA Invs., LLC*, 2018 NCBC LEXIS 11, at *44 (N.C. Super. Ct. Feb. 1, 2018) ("While some causes of action allow nominal damages, others require as an essential element . . . that [the] plaintiff incur actual damage[s]." (alterations in original) (quotation marks omitted)). Negligence is one such cause of action for which a Plaintiff may be entitled to nominal damages. *Smith v. Hamrick*, 159 N.C. App 696, 700, 583 S.E.2d 676, 680 (2003); *Title Ins. Co. of Minn. v. Smith, Debnam, Hibbert & Pahl*, 119 N.C. App. 608, 611, 459 S.E.2d 801, 804 (1995). Therefore, the Court concludes that Locke is not entitled to summary judgment on Plaintiffs' negligence claim on the basis that Plaintiffs have not presented sufficient evidence that they suffered actual damages because a negligence claim does not require a showing of actual damages as an element of the claim.

80. As to Plaintiffs' breach of fiduciary duty, constructive fraud, and UDTP claims, the party seeking damages carries the burden of proving damages, which must be done by "show[ing] that the amount of damages is based upon a standard that will allow the finder of fact to calculate the amount of damages with reasonable certainty." *Compton v. Kirby*, 157 N.C. App. 1, 17, 577 S.E.2d 905, 915 (2003). Although "[a]bsolute certainty is not required," Plaintiffs must present evidence of damages that is "sufficiently specific and complete to permit the jury to arrive at a reasonable conclusion." *Id.*

81. Locke contends that he is entitled to summary judgment on Plaintiffs' breach of fiduciary duty, constructive fraud, and UDTP claims because Plaintiffs have not produced any evidence that they suffered damages as a result of Locke's alleged

conduct. (Locke's Br. Supp. 16–20; Locke's Br. Opp'n 11–12.) Locke contends that Plaintiffs cannot produce such evidence because they suffered no damages in that they ultimately received their respective shares from the sale of the Lake House. (Locke's Br. Opp'n 12.) Following the sale of the Lake House, Randolph Road transferred the net proceeds from the Lake House sale ($726,776.76) to the Trust. Locke contends that, as 5% owners of Randolph Road, Plaintiffs were collectively entitled to $109,016.51, representing their 15% ownership interest (or $36,338.84 each for their respective 5% interests). (Locke Aff. ¶ 56.) Locke avers that at all times he reserved Trust assets sufficient to pay Plaintiffs their $109,106.51 proportionate share. (Locke Aff. ¶ 56f.) Locke contends that, at the end of his trusteeship, he redistributed $422,846.49 to Hanzel to be distributed to Plaintiffs, and Plaintiffs thus received the funds to which they were entitled from the sale of the Lake House. (Locke Aff. ¶ 56h.) In support of his position, Locke points to the individual Plaintiffs' depositions in which they deferred to their lawyers and experts as to what their damages were and the fact that Plaintiffs' expert witness, when asked what the total damages were, "repeatedly demurred, related hypothetical examples of how damages could exist, and said it would be on 'a judge or jury [to] make that decision.'" (Locke's Br. Opp'n 12–13.) Locke also submitted the affidavit of a CPA who is certified in financial fraud and forensics, who averred that Plaintiffs' expert disclosure does not provide a claim or evidence of any harm to Plaintiffs. (Aff. Erik Lioy ¶¶ 5, 9, ECF No. 43.4.)

82. Plaintiffs counter that because Locke did not segregate Randolph Road's funds, he has not shown that Plaintiffs received all the assets to which they were entitled, especially in light of the fact that many of the assets distributed to Plaintiffs after the Trust closed could not possibly have been generated from Randolph Road, such as their deceased father's record collection, burial flag, and urn. (Pls.' Br. Opp'n 18.) Plaintiffs argue that they have demonstrated sufficient damages as they are only required to prove "the extent of the harm and the amount of money representing adequate compensation with as much certainty as the nature of the tort and the circumstances permit." (Pls.' Br. Opp'n 15 (emphasis omitted) (quoting *Hudgins v. Wagoner*, 204 N.C. App. 480, 492, 694 S.E.2d 436, 446 (2010)).) Plaintiffs' expert testified that he was "certain that there are damages" and opined that a judge or jury could determine that damages ranged from $500,000 to $700,000. (Locke's Mot. Summ. J. Ex. H, at 13:7, 21:21–25, ECF No. 43.14.) Plaintiffs' expert further testified that Plaintiffs were damaged by not having use of the funds from the sale of the Lake House "for some number of seven or so years." (Locke's Mot. Summ. J. Ex. H, at 140:16–24.)

83. Having reviewed the briefs, the arguments of counsel, and the accounting records submitted by the parties, the Court cannot conclude, on the record before it, that Plaintiffs received all of the assets to which they were entitled from Randolph Road or the Trust. Additionally, Plaintiffs have produced extensive accounting records for the Trust, annual balance sheets for Randolph Road, and evidence of what the individual Plaintiffs ultimately received after the Trust terminated. Based on

these records, the Court concludes that Plaintiffs have presented sufficient evidence for a jury to calculate damages, if any, with reasonable certainty. Therefore, the Court concludes that Locke has not demonstrated that he is entitled to judgment as a matter of law on the basis that Plaintiffs cannot produce sufficient evidence of their damages.

84. Accordingly, the Court concludes that a question of material fact exists as to whether Plaintiffs were damaged by Locke's alleged breaches of fiduciary duty, constructive fraud, and UDTP, and if so, in what amount.

### c. Joint and Several Liability

85. Locke argues that, to the extent Plaintiffs seek to hold him jointly and severally liable for the Hanzel Defendants' actions, he is entitled to summary judgment on Plaintiffs' claims for constructive fraud (Counts IV and VII) and UDTP (Count XI) because he is shielded from liability for an agent's actions pursuant to N.C. Gen. Stat. §§ 32-27(24) and 36C-8-807(a). (Locke's Mot. Summ. J. ¶ 5; Locke's Br. Supp. 26–27.)

86. Section 32-26 of the North Carolina General Statutes provides that a testator may, by an express intention to do so in a will or other trust instrument, grant a fiduciary any or all of the powers enumerated in N.C. Gen. Stat. § 32-27, as those powers existed at the time the will or trust instrument was signed. Article X of Hampton's will granted fiduciaries appointed under the will, including the trustee

of the Trust, all of the powers set forth in § 32-27, except for § 32-27(29).[5]  (Compl.

Ex. A., Art. X.)  In 2004, when Hampton signed his will, N.C. Gen. Stat. § 32-27(24)

provided, as it does now, that fiduciaries are empowered

> [t]o employ and compensate . . . persons deemed by the fiduciary needful to advise or assist in the proper . . . administration of any trust, including, but not limited to, agents, accountants, brokers, [and] attorneys-at-law . . . ; and to do so without liability for any neglect, omission, misconduct, or default of such agent or representative *provided he was selected and retained with due care on the part of the fiduciary*.

N.C. Gen. Stat. § 32-27(24) (2004) (emphasis added).

87.     Similarly, the North Carolina Uniform Trust Act (the "Trust Act") provides

that "[a] trustee may delegate duties and powers that a prudent trustee of comparable

skills could properly delegate under the circumstances."  N.C. Gen. Stat. § 36C-8-

807(a).  The Trust Act further provides that a trustee "is not liable to the beneficiaries

or to the trust for an action of the agent to whom the function was delegated[,]"

provided that the trustee "exercise[d] reasonable care, skill, and caution in:

(1) [s]electing an agent; (2) [e]stablishing the scope and terms of the delegation . . . ;

and (3) [p]eriodically reviewing the agent's actions[.]"  *Id.* § 36C-8-807(a), (c).

88.     Locke contends that Hanzel was a trusted advisor to the decedent and was

selected by the decedent as manager for various entities.  (Locke's Br. Supp. 27.)

Thus, Locke argues that it was reasonable for Locke to retain Hanzel as counsel for

the Trust and to reappoint Hanzel as manager of Randolph Road.  (Locke's Br. Supp.

---

[5] Section 32-27(29), which relates to a fiduciary's authority to classify income and principal of an estate or trust, is not relevant to the Court's determination of the Motions.

27.) He further asserts that there was never any indication that Hanzel should not be trusted. (Locke's Br. Supp. 27.) Locke testified that, although he had no interactions with Hanzel prior to Hampton's death, Locke was aware that Hanzel had served as trusted counsel to Hampton and his businesses for many years during Hampton's life and, therefore, Locke reasonably continued to use Hanzel's services as counsel for the Trust and manager of Randolph Road. (Locke Aff. ¶¶ 40–42.) Locke also presented the affidavit of John Rodgers ("Rodgers"), an expert witness who is a principal of a fiduciary litigation consulting firm. (Aff. John Rodgers ¶¶ 2, 6, ECF No. 43.5.) Rodgers opined that Locke is shielded from liability for Hanzel's conduct pursuant to N.C. Gen. Stat. § 32-27(24) because "[i]f Hanzel's hiring was imprudent, responsibility lies with Thomas Hampton, not Locke." (Rodgers Aff. ¶ 10.)

89. Plaintiffs contend that Locke's argument that, because the decedent selected Hanzel, it was reasonable for Locke to retain Hanzel as an agent for the better part of a decade after the decedent's death, is untenable. (Pls.' Br. Opp'n 20.) Plaintiffs contend that Locke had a duty to (1) use due care in selecting Hanzel as an agent and retaining Hanzel's services from 2007 to 2014, and (2) periodically review Hanzel's actions. (Pls.' Br. Opp'n 20–21.) Plaintiffs argue that these obligations could not be pushed off to the decedent who passed away in 2004. (Pls.' Br. Opp'n 20–21.) In support of their position, Plaintiffs submit Locke's deposition testimony that he continued to appoint Hanzel as manager of Randolph Road each year, although he only spoke to Hanzel infrequently after the caveat period and the early years of the Trust and did not at any time do any research or consider whether Hanzel was still a

suitable person to act as manager. (Pls.' Mot. Partial Summ. J. Ex. 2, at 80:18–81:15, 85:11–15.) Plaintiffs thus argue that whether Locke used due care in retaining Hanzel or reviewing Hanzel's actions presents a genuine issue of material fact that precludes summary judgment. (Pls.' Br. Opp'n 21.)

90. Based on the foregoing, the Court finds Plaintiffs' evidence and contention persuasive and concludes that a genuine issue of material fact exists as to whether Locke exercised due care in his selection, retention, and supervision of Hanzel as manager of Randolph Road and as counsel to the Trust. Therefore, to the extent that Plaintiffs' breach of fiduciary duty claims are premised on holding Locke jointly and severally liable for Hanzel's conduct, the Court concludes that Locke is not entitled to summary judgment on Plaintiffs' breach of fiduciary duty claims.

## 2. Breach of Fiduciary Duty as Majority Owner of Randolph Road

91. The Complaint alleges that Locke, as majority owner of Randolph Road, breached fiduciary duties owed to Plaintiffs as minority owners in that Locke: (1) used the proceeds from the sale of the Lake House owned by Randolph Road to pay off the Jo-Wall Loan, a loan made by a company for which Locke worked; (2) provided the proceeds of the sale of the Lake House and other income from Randolph Road to the Trust as an improper distribution disguised as a loan without making a proportionate distribution to the minority owners as required by N.C. Gen. Stat. § 57D-4-03; and (3) then removed the loan from the Trust's records without explanation after LaFrance remarried. (Compl. ¶¶ 50–56, 67, 70–77, 83–86, 126–29.)

92. Plaintiffs contend that they are entitled to summary judgment because it is undisputed that Locke transferred money from Randolph Road to the Trust (i.e., the majority owner), without transferring a proportionate amount to each of the individual Plaintiffs based on their minority ownership interests, and thus made an improper distribution and did not act in the best interests of the company or its minority owners. (Pls.' Br. Supp. 13–14.) Plaintiffs further argue that Locke breached his fiduciary duties to the individual Plaintiffs as minority owners because Locke distributed Randolph Road's funds to the Trust, and then from the Trust to LaFrance, to enable her to repay the Jo-Wall Loan, a transaction in which Locke had a conflict of interest. (Pls.' Br. Opp'n 1.)

93. Locke does not dispute that the transfer of assets from Randolph Road to the Trust was a distribution; instead, Locke raises the various defenses discussed above. (Locke's Br. Opp'n 1, 15; Locke's Mot. Summ. J. ¶ 5.) Having concluded that genuine issues of material fact exist as to Locke's statute of limitations defense and his argument that Plaintiffs cannot prove damages, the Court concludes that Plaintiffs are not entitled to summary judgment on their breach of fiduciary duty claim against Locke as majority owner of Randolph Road.

### 3. Breach of Fiduciary Duty as Trustee and Breach of Trust

94. Plaintiffs assert claims against Locke for both breach of fiduciary duty as trustee and breach of trust. (Compl. 18–19.) As to Plaintiffs' breach of fiduciary duty claim, Plaintiffs allege that Locke failed to act in good faith or to protect Trust assets for the benefit of the beneficiaries. (Compl. ¶¶ 139–40.) As to Plaintiffs' breach of

trust claim, Plaintiffs allege that Locke breached numerous provisions of the Trust Act. (Compl. ¶ 144.)

95. Notwithstanding the many provisions of the Trust Act enumerated in the Complaint, the Court concludes solely for purposes of Locke's Motion for Summary Judgment, based on the factual allegations of the Complaint, the record before it, and the arguments of counsel in their briefs and at the hearing, that Plaintiffs' breach of trust claim amounts to a claim that Locke violated the duty of loyalty set forth in N.C. Gen. Stat. § 36C-8-802. Because the Court can find no meaningful distinction in North Carolina case law between a common law claim for breach of fiduciary duty by a trustee premised on a conflict of interest and a statutory claim for breach of trust, the Court will analyze both claims together.

96. "The trustee of an irrevocable testamentary trust is a fiduciary." *Heinitsh v. Wachovia Bank, Nat'l Ass'n*, 192 N.C. App. 570, 573, 665 S.E.2d 541, 544 (2008). "Trust beneficiaries may expect and demand the trustee's complete loyalty in the administration of any trust." *In re Testamentary Tr. of Charnock*, 158 N.C. App. 35, 42, 579 S.E.2d 887, 891 (2003). Pursuant to N.C. Gen. Stat. § 36C-8-802(c), a rebuttable presumption that a transaction involving trust property was affected by a conflict of interest arises if the trustee enters into a transaction with:

> (3) An agent, attorney, employee, officer, director, member, manager, or partner of the trustee, or an entity that controls, is controlled by, or is under common control with the trustee; or
>
> (4) Any other person or entity in which the trustee, or a person that owns a significant interest in the trust, has an interest or relationship that *might* affect the trustee's best judgment.

N.C. Gen. Stat. § 36C-8-802(c)(3)–(4) (emphasis added). "A violation by a trustee of a duty the trustee owes under a trust is a breach of trust." *THZ Holdings, LLC v. McCrea*, 231 N.C. App. 482, 485, 753 S.E.2d 344, 348 (2013) (citing N.C. Gen. Stat. § 36C–10–1001).

97. Hampton's will established a testamentary trust naming the individual Plaintiffs as beneficiaries and appointing Locke as trustee. (Compl. Ex. A, Art. VII.A.4, Art. IX.B.) Locke served as trustee from 2007 until he resigned in 2014. (Locke Aff. ¶¶ 7, 35, 57–69.) Therefore, Locke, as trustee, owed fiduciary duties to Plaintiffs as beneficiaries of the Trust.

98. Plaintiffs allege that Locke, because of his association with Jo-Wall, engaged in self-dealing by distributing $353,100 from the Trust to LaFrance so she could repay the Jo-Wall Loan. (Compl. ¶¶ 70–76.) Plaintiffs argue that the transaction involved a conflict of interest because Locke is employed by Jo-Wall and is an officer and director of one of Jo-Wall's members. (Pls.' Br. Opp'n 4.) Plaintiffs contend that by providing LaFrance with a loan from Jo-Wall that bore 7% interest and was secured by a deed of trust, Locke controlled both sides of the transaction. (Pls.' Br. Opp'n 3.) In support of their position, Plaintiffs point to the fact that the Vermont Secretary of State lists Locke as the treasurer for and a director of JDN, Inc., a Vermont corporation that operates under the trade name JoWall Limited Partnership. (Aff. Andrew L. Fitzgerald Ex. 3, ECF No. 45.1; *see also* Pls.' Br. Opp'n Ex. 1, at 19:10–20:18 (providing Locke's testimony that JDN is a partner of Jo-Wall).) Plaintiffs also rely on the opinion of their expert, William A. Barbee, a CPA who is

certified in business valuation and financial forensics, that "Locke's management of the Trust appears to present conflicts of interest and potential self-dealing," which included the Jo-Wall Loan. (Pls.' Mot. Partial Summ. J. Ex. 6, at 1, 3, ECF No. 41.6.)

99. Locke's status as an employee of Jo-Wall and as an officer and director of one of Jo-Wall's members creates a rebuttable presumption that the Jo-Wall Loan created a conflict of interest. N.C. Gen. Stat. § 36C-8-802(c)(3)–(4). In response, Locke argues that he does not have an interest in Jo-Wall that creates a conflict of interest and that the Jo-Wall Loan was made on terms that were fair to the Trust. (Locke's Br. Supp. 8–9, 21–23.) Locke avers that he is an at-will, salaried employee of Jo-Wall and is "neither a partner, owner, nor shareholder of Jo-Wall[,]" does not own any equity interest in Jo-Wall, does not receive performance-based compensation or bonuses from Jo-Wall, and does not share in any of Jo-Wall's profits. (Locke Aff. ¶¶ 2, 4.) Locke further avers that although he serves as JDN's treasurer and is a member of its board of directors, Locke is not a partner, owner, or shareholder and does not receive compensation of any kind from JDN. (Locke Aff. ¶ 6.) Locke also submitted by affidavit the expert opinion of Rodgers that there is "no evidence of transactions performed by Locke for his personal account or that were affected by a conflict between Locke's fiduciary and personal interests." (Rodgers Aff. ¶ 8.b.)

100. Although Locke has presented evidence in an attempt to rebut the presumption that the Jo-Wall Loan created a conflict of interest, the Court cannot conclude that Locke is entitled to judgment as a matter of law. The fact that Locke did not own an interest in Jo-Wall or that he did not receive any compensation from

JDN does not effectively rebut the presumption under N.C. Gen. Stat. § 36C-8-802(c)(3)–(4) that a conflict of interest exists where the trustee enters into a transaction with an entity that controls the trustee or with which the trustee "has an interest or relationship that *might* affect the trustee's best judgment." N.C. Gen. Stat. § 36C-8-802(c)(4) (emphasis added). An employer generally has some right to control the actions of its employee. Thus, Jo-Wall may have been able to exert influence over Locke that could have affected his fair administration of the Trust. Further, Locke's relationship with both Jo-Wall and JDN is an interest or relationship that may affect his judgment in relation to the Jo-Wall Loan. Thus, the evidence presents a genuine issue of material fact as to whether the Jo-Wall Loan presented a conflict of interest.

101. Therefore, the Court concludes that neither Plaintiffs nor Locke are entitled to summary judgment on Plaintiffs' claims for breach of trust and breach of fiduciary duty against Locke as trustee.

### 4. Constructive Fraud

102. Plaintiffs assert separate claims against Locke for constructive fraud related to his role as majority owner of Randolph Road, on the one hand, and as trustee of the Trust, on the other. (Compl. 18, 20.) Because neither the Complaint nor the parties' briefs make any meaningful distinction between the allegations that support the constructive fraud claim as to Randolph Road and as to the Trust, the Court will address both claims together. (*Compare* Compl. ¶¶ 131–36, *with* Compl. ¶¶ 148–52.)

103. "The elements of a claim of constructive fraud require: (1) a relationship of trust and confidence, (2) that the defendant took advantage of that position of trust in order to benefit himself, and (3) that plaintiff was, as a result, injured." *Trantham v. Michael L. Martin, Inc.*, 228 N.C. App. 118, 123, 745 S.E.2d 327, 332 (2013) (quotation marks omitted). "The primary difference between pleading a claim for constructive fraud and one for breach of fiduciary duty is the [additional] constructive fraud requirement that the defendant benefit himself." *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 294, 603 S.E.2d 147, 156 (2004).

104. Locke moves for summary judgment on both of Plaintiffs' constructive fraud claims on the basis that Plaintiffs have not presented sufficient evidence that Locke took advantage of his position of trust in order to benefit himself. (Locke's Br. Supp. 16–21.)

105. The Complaint alleges that Locke took advantage of his position of trust and confidence to benefit himself and LaFrance by (1) distributing proceeds from the sale of the Lake House to LaFrance to be used to repay the Jo-Wall Loan, and (2) making improper and commercially unreasonable loans from Randolph Road to the Trust to give "LaFrance and Locke access to cash from Randolph Road without having to make distributions" to the minority owners. (Compl. ¶¶ 52, 58, 60–67, 81–87.) Plaintiffs argue that they have presented sufficient evidence that Locke sought to benefit himself because the record shows that (1) Locke was able to extend the life of the Trust by making improper distributions from Randolph Road to the Trust, and was thereby able to receive trustee commissions for longer than he otherwise would

have, and (2) Locke used Trust assets to repay the Jo-Wall Loan, which generated 7% interest despite being risk free. (Pls.' Br. Opp'n 2–3.) Bryan, in his affidavit, stated that Locke derived a benefit from the Jo-Wall Loan because, as a person associated with Jo-Wall, Locke would "obviously have an interest in Jo-Wall continuing to exist and operate and be able to pay him whatever he's paid." (Locke's Mot. Summ. J. Ex. D, at 131:16–23, ECF No. 43.7.)

106. To establish that Locke sought to benefit himself, Plaintiffs must show that "the benefit sought was more than a continued relationship with the plaintiff[.]" *Clay v. Monroe*, 189 N.C. App. 482, 488, 658 S.E.2d 532, 537 (2008). Our Court of Appeals has held that "payment of a fee to a defendant for work done by that defendant does not by itself constitute sufficient evidence that the defendant sought his own advantage in the transaction[,]" particularly where there is no evidence that the amount paid to defendant for his services would have been different in the absence of the alleged breached of fiduciary duty. *NationsBank of N.C., N.A. v. Parker*, 140 N.C. App. 106, 114, 535 S.E.2d 597, 602 (2000) (citing *Barger*, 346 N.C. at 667, 488 S.E.2d at 224). Therefore, the Court concludes that Plaintiffs' argument that Locke improperly benefited himself by extending the life of the Trust by making improper distributions so that he could continue receiving trustee commissions is unavailing, particularly where there is no evidence that the Trust was in danger of running out of funds in 2008 when Randolph Road's funds were transferred to the Trust.

107. As to whether Plaintiffs have presented sufficient evidence that Locke sought to benefit himself in relation to the Jo-Wall Loan, at the time of the filing of

the Complaint and during discovery, Plaintiffs were under the mistaken impression that Jo-Wall was owned by Locke because Locke sent correspondence to Plaintiffs on Jo-Wall's letterhead. (Compl. ¶ 52; Locke's Mot. Summ. J. Ex. F, at 114:5–116:1, ECF No. 43.12.) However, Locke has presented evidence that he is not an interest owner in Jo-Wall and does not receive any sort of performance-based compensation. (Locke Aff. ¶¶ 2, 4.) Locke also presented evidence that he is not a partner, owner, or shareholder of, and does not receive any compensation from, JDN. (Locke Aff. ¶ 6.) Nevertheless, Plaintiffs have produced evidence that Locke is the treasurer for and a director of JDN, and that JDN is a principal of Jo-Wall. (Fitzgerald Aff. Ex. 3.) Based on the record before it, the Court concludes that a genuine issue of material fact exists as to whether Locke took advantage of his position of trust in order to benefit himself.

108. Accordingly, the Court concludes that Locke is not entitled to summary judgment on Plaintiffs' constructive fraud claims (Counts IV and VII).

### 5. Negligence

109. Although Locke's Motion for Summary Judgment also contends that Locke is entitled to summary judgment on Plaintiffs' negligence claim because Plaintiffs have failed to allege essential elements and/or cannot forecast sufficient evidence of their claim, Locke's briefs fail to elaborate further on this argument, apart from Locke's argument that Plaintiffs cannot prove damages. (Locke's Mot. Summ. J. ¶ 3; Locke's Br. Supp. 20–26; Locke's Reply Br. 8–10.) Having concluded that a genuine issue of material fact exists as to whether Plaintiffs were damaged, and if so, by how

much, the Court concludes that Locke has not demonstrated that he is entitled to summary judgment on Plaintiffs' negligence claim.

### 6. UDTP

110. Locke moves for summary judgment on Plaintiffs' UDTP claim, arguing that Plaintiffs have failed to allege essential elements or otherwise cannot forecast sufficient evidence of their UDTP claim to withstand summary judgment. (Locke's Mot. Summ. J. ¶¶ 2–3.)

111. "To prevail on a UDTP claim under Chapter 75 of our General Statutes, a [p]laintiff must show: (1) [the] defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Hedgepeth v. Lexington State Bank*, 228 N.C. App. 49, 55, 744 S.E.2d 138, 143 (2013) (alterations in original) (quotation marks omitted). "Plaintiff[s] must first establish that [Locke's] conduct was 'in or affecting commerce' before the question of unfairness or deception arises." *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 592, 403 S.E.2d 483, 492 (1991).

112. Notwithstanding § 75-1.1's broad definition of "commerce" as "all business activities, however denominated," N.C. Gen. Stat. § 75-1.1(b), "[o]ur Supreme Court has observed that the history of the [UDTP] Act [(the "UDTPA" or "Act")] indicates that the General Assembly was targeting 'unfair and deceptive interactions between market participants[,]'" *Bickley v. Fordin*, 811 S.E.2d 671, 674 (N.C. Ct. App. 2018) (emphasis omitted) (quoting *White v. Thompson*, 364 N.C. 47, 52, 691 S.E.2d 676, 679 (2010)). "To accomplish this goal, the General Assembly explained that the Act would

regulate two types of interactions in the business setting: (1) interactions between businesses, and (2) interactions between businesses and consumers." *White*, 364 N.C. at 52, 691 S.E.2d at 679. Our courts have repeatedly held that "[t]he General Assembly did not intend for the Act to regulate purely internal business operations." *Id.* at 48, 691 S.E.2d at 676; *Alexander v. Alexander*, 792 S.E.2d 901, 904 (N.C. Ct. App. 2016).

113. Locke contends that he is entitled to summary judgment on Plaintiffs' UDTP claim because the alleged conduct was not in or affecting commerce as it involved only the Trust and Randolph Road, and that any unfair or deceptive conduct was directed only at the beneficiaries of the Trust and the members of Randolph Road, who were one and the same. (Locke's Br. Supp. 24.) Locke thus contends that any unfair or deceptive conduct was not directed at any other market participant and had no impact on the market. (Locke's Br. Supp. 24.)

114. Plaintiffs argue that Locke's argument ignores the fact that Locke held two separate fiduciary roles (i.e., as majority owner of Randolph Road and as trustee of the Trust), and that Locke's conduct involved a testamentary trust; two real estate transactions (the sale of the Lake House and the purchase of LaFrance's new home); dealings with Jo-Wall, a foreign entity; and the operation of Randolph Road, which leased professional offices. (Pls.' Br. Opp'n 19–20.) Based on those assertions, Plaintiffs contend that it would be premature to dismiss the UDTP claim and that the Court should determine whether Locke's conduct was in or affecting commerce following the presentation of all of the evidence at trial. (Pls.' Br. Opp'n 20.)

115. Plaintiffs' argument that Locke's conduct was in or affecting commerce because it involved two real estate transactions, the lease of a medical office building, and the Jo-Wall Loan, (i.e., that it involved persons outside of Randolph Road or the Trust), is unavailing. Where plaintiff and defendant are both part of a single market participant, yet the alleged unfair or deceptive conduct in some way involved other market participants, our courts have looked to whether the defendant directed the unfair or deceptive conduct at the outside participants to determine whether the alleged conduct was "in or affecting commerce" under the UDTPA. *Alexander*, 792 S.E.2d at 905 (concluding that defendant co-owner's conduct was not in or affecting commerce where defendant caused the close corporation to make inflated payments to defendant for use of defendant's property because defendant "unfairly and deceptively interacted only with [Plaintiff, his co-owner]" (alteration in original)); *Chisum*, 2017 NCBC LEXIS 102, at *36 (concluding that defendants' conduct was not in or affecting commerce where defendants, as managers of LLCs in which plaintiff had an interest, diverted corporate assets to other companies owned by defendants, because the alleged unfair and deceptive conduct was not directed at other market participants). Because Plaintiffs have presented no evidence that any unfair or deceptive conduct was directed at the other market participants involved in the real estate transactions, the medical office lease, or the Jo-Wall Loan, these transactions do not demonstrate that Locke's conduct was in or affecting commerce.

116. The Court reaches the same conclusion concerning Locke's conduct involving the Trust and Randolph Road. The Trust was the majority owner of

Randolph Road. The other members of Randolph Road were beneficiaries of the Trust. Although this case technically involved two separate legal entities—the Trust and Randolph Road—the Court can discern no meaningful impact on other market participants from Locke's alleged conduct. That is, the beneficiaries of the Trust and the minority owners of Randolph Road who were allegedly harmed by unfair and deceptive conduct are one and the same. Plaintiffs allege that Locke, as trustee of the Trust, engaged in unfair and deceptive conduct toward them as beneficiaries of the Trust. Plaintiffs allege that Locke, acting as controlling owner of Randolph Road, engaged in unfair and deceptive conduct toward them as minority owners. These allegations demonstrate that any unfair or deceptive conduct had no meaningful impact on commerce, but rather was contained solely within a single market participant. *Alexander*, 792 S.E.2d at 905.

117. Accordingly, the Court concludes that Locke is entitled to summary judgment on Plaintiffs' UDTP claim, and that claim is dismissed with prejudice.

### 7. Civil Conspiracy

118. It is well-established that North Carolina does not recognize a separate cause of action for civil conspiracy. *Strickland v. Hedrick*, 194 N.C. App. 1, 19, 669 S.E.2d 61, 73 (2008). "Only where there is an underlying claim for unlawful conduct can a plaintiff state a claim for civil conspiracy . . . ." *Sellers v. Morton*, 191 N.C. App. 75, 83, 661 S.E.2d 915, 922 (2008). To establish a civil conspiracy theory of liability, Plaintiffs must demonstrate the existence of a conspiracy, wrongful acts done by certain of the alleged conspirators, and injury. *Newton*, 788 S.E.2d at 663. As to the

first element, Plaintiffs must offer "proof of an agreement between two or more persons." *Sellers*, 191 N.C. App. at 83, 661 S.E.2d at 922. "Although civil liability for conspiracy may be established by circumstantial evidence, the evidence of the agreement must be sufficient to create more than a suspicion or conjecture . . . ." *Cameron v. New Hanover Mem'l Hosp., Inc.*, 58 N.C. App. 414, 438, 293 S.E.2d 901, 916 (1982).

119. Plaintiffs allege that in administering the Trust and the Estate, Locke and Hanzel worked together to benefit LaFrance to the harm of the individual Plaintiffs and that LaFrance was complicit in and encouraged Defendants to run Randolph Road for her benefit. (Compl. ¶¶ 48–49.) More specifically, Plaintiffs allege that LaFrance and Locke conspired to effectuate the Jo-Wall Loan and payment thereof from the Lake House sale "to insure that she and he reaped the maximum benefit possible from the Trust," (Compl. ¶¶ 60, 75), and that Defendants and LaFrance conspired to "effectuate the lack of payments of distribution of profits" from Randolph Road to the individual Plaintiffs "to insure that they reaped the maximum benefit possible from Randolph Road and the Trust," (Compl. ¶¶ 68, 79).

120. Locke argues that he is entitled to summary judgment on Plaintiffs' conspiracy claim because Plaintiffs have failed to plead or forecast any evidence of an agreement between Locke and Hanzel. (Locke's Br. Supp. 25–26.) Locke notes that Susan testified in her deposition that she believed Hanzel and Locke conspired together in their handling of the Trust and Randolph Road because "the numbers never lined up" on the accounting records and "they were always going back and

forth," and "it seemed like they were benefitting from, you know, from working together." (Locke's Br. Supp. 25; Locke's Mot. Summ. J. Ex. E, at 68:14–23.)

121. Plaintiffs presented as evidence of a conspiracy between Locke and LaFrance the deposition testimony of LaFrance that she and her husband had been "very good friends" with Locke and his girlfriend and that LaFrance socialized with Locke on occasion during the administration of the Trust. (Pls.' Mot. Partial Summ. J. Ex. 3, at 29:19–23, ECF No. 41.3.) Plaintiffs also presented Hanzel's response to an interrogatory in which he stated that LaFrance and Locke dealt with each other exclusively and directly regarding distributions from the Trust and that actions that were detrimental to Plaintiffs, if any, "were orchestrated and conducted" between LaFrance and Locke. (Pls.' Mot. Partial Summ. J. Ex. 5, Resp. Interrog. No. 8, ECF No. 41.5.)

122. As to whether Locke conspired with Hanzel, the evidence consists of (1) Susan's deposition testimony that she thought Locke and Hanzel "were in cahoots" and that their handling of the Trust and Estate "[did]n't smell right," (Locke's Mot. Summ. J. Ex. F, at 144:16–23); (2) Locke's deposition testimony that he asked Hanzel to consult with a CPA "to ensure the net operating loss carryforward that I had in the [T]rust would still be available to the children when I transferred the assets back to the successor trustee[,]" (Pls.' Mot. Partial Summ. J. Ex. 2, at 58:13–19); and (3) Locke's deposition testimony that he and Hanzel had a conversation about transferring Randolph Road's funds to the Trust and that Hanzel wrote the check transferring funds, (Pls.' Mot. Partial Summ. J. Ex. 2, at 57:11–23).

123. The Court concludes that Plaintiffs have not presented sufficient evidence that Locke conspired with LaFrance or Hanzel to commit a wrongful act to withstand Locke's Motion for Summary Judgment. Neither evidence that LaFrance and Locke had a prior personal relationship and socialized occasionally during Locke's administration of the Trust nor evidence that Hanzel disclaimed any knowledge of a conspiracy between Locke and LaFrance demonstrates an agreement to commit a wrongful act. Further, evidence that Hanzel, as manager of Randolph Road, and Locke, as trustee and acting majority owner, discussed financial decisions regarding the company does not constitute sufficient evidence that Locke and Hanzel conspired to wrongfully transfer assets from Randolph Road to the Trust.

124. The Court cannot find any evidence in the record, either direct or circumstantial, as opposed to allegations, that does more than raise a suspicion that Locke and Hanzel conspired to commit a wrongful act. Accordingly, the Court concludes that Plaintiffs have failed to come forward with sufficient evidence of an agreement to create a genuine issue of material fact and, therefore, Locke is entitled to summary judgment on Plaintiffs' civil conspiracy claim.

### 8. Accounting

125. The Complaint alleges that Locke was required to provide requested information to Plaintiffs as minority owners of Randolph Road pursuant to N.C. Gen. Stat. § 57D-3-04. (Compl. ¶ 171.) The Complaint also alleges, as a result of Locke's breaches of fiduciary duty and breach of trust, that Locke must account for the

transactions and conduct described in the Complaint pursuant to common law and N.C. Gen. Stat. § 36C-10-1000(4). (Compl. ¶ 172.)

126. Locke moves for summary judgment on Plaintiffs' claim for accounting and information, arguing that these are remedies, not separate causes of action. (Locke's Br. Supp. 27.) Plaintiffs did not address Locke's Motion for Summary Judgment as to their claim for inspection rights and an accounting.

127. Although a court may order an accounting as an equitable remedy, *Mkt. Choice, Inc. v. New Eng. Coffee Co.*, 5:08-CV-90, 2009 U.S. Dist. LEXIS 73627, at *35–36 (W.D.N.C. Aug. 18, 2009) (applying North Carolina law), each member of an LLC is statutorily granted an affirmative right to inspect certain information pertaining to the company, N.C. Gen. Stat. § 57D-3-04(a). To exercise that right, a plaintiff must request to inspect the company's records and be denied an opportunity to do so. *See Chisum*, 2017 NCBC LEXIS 102, at *29–30 (dismissing claim brought pursuant to § 57D-3-04 where plaintiff did not allege that he requested to inspect company records or was denied the opportunity to do so). Plaintiffs allege that they demanded that Locke provide them with an accounting of the Trust's assets, and that, although Locke produced some records, he did not produce an adequate accounting for Randolph Road. (Compl. ¶ 35.) Locke admitted that such demands were made. (Locke's Answer ¶ 35.) Further, Susan sent Locke several letters regarding the Trust and Randolph Road and requested a "full estate accounting." (Locke's Br. Opp'n Exs. A, E, G.)

128. The Court concludes that Plaintiffs have presented sufficient evidence that they requested to inspect records and were denied the opportunity to do so to survive summary judgment on their claim for an accounting under the LLC Act.

129. As to Plaintiffs' claim that Locke is required to provide an accounting of the Trust, N.C. Gen. Stat. § 36C-10-1001(b)(4) provides that a court may remedy a breach of trust by ordering a trustee to account. Thus, Locke is correct that Plaintiffs' accounting claim is a remedy. However, because the Court has concluded that Locke is not entitled to summary judgment on Plaintiffs' claims that Locke breached his duties to the beneficiaries of the Trust, Plaintiffs may be entitled to the requested accounting, should they prove their claims at trial.

130. Accordingly, Locke is not entitled to summary judgment on Plaintiffs' claim for inspection of Randolph Road's records, and Plaintiffs may maintain their request for the remedy of an accounting of the Trust.

## V. CONCLUSION

131. For the foregoing reasons, the Court **DENIES** Plaintiffs' Motion for Partial Summary Judgment and **GRANTS in part** and **DENIES in part** Locke's Motion for Summary Judgment as follows:

    A.    The Court **DENIES** Locke's Motion for Summary Judgment on Plaintiffs' claims for breach of fiduciary duty (Counts III and V), constructive fraud (Counts IV and VII), breach of trust (Count VI), negligence (Count VIII), and accounting and information rights (Count X).

B.      The Court **GRANTS** Locke's Motion for Summary Judgment on
        Plaintiffs' claims for unfair or deceptive trade practices (Count XI)
        and civil conspiracy (Count XII), each of which is dismissed with
        prejudice.

C.      The Court will set this matter for trial by separate Order.

**SO ORDERED**, this the 29th day of June, 2018.


                                      /s/ Michael L. Robinson
                                      _____
                                      Michael L. Robinson
                                      Special Superior Court Judge
                                        for Complex Business Cases